Opinion filed July 12,
2012

  

 

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-12-00070-CV 

                                                    __________

 

             IN THE
INTEREST OF A.W.C. AND G.A.C., CHILDREN

 

                                   On
Appeal from the 106th District Court

                                                          Dawson
County, Texas

                                                Trial
Court Cause No. 11-03-18547 

 



 

M
E M O R A N D U M   O P I N I O N

            After
a bench trial, the trial court entered an order terminating the parental rights
of the mother and father of A.W.C. and G.A.C.[1]
 The children’s mother (Connie) and father (Antonio) have each filed a notice
of appeal.  We affirm.

Issues

            Connie
presents three points of error for review, and Antonio presents eight issues
for review.  All of the points of error and issues involve challenges to the
sufficiency of the evidence to support termination of Connie’s and Antonio’s
parental rights.  In her points of error, Connie contends that the evidence was
legally and factually insufficient to support the trial court’s findings (1)
that she constructively abandoned the children while they were in the temporary
conservatorship of the Department of Family and Protective Services (the
Department); (2) that she failed to comply with the provisions of a court order
that specifically established the actions necessary for her to obtain the
return of her children; and (3) that, because the Department made reasonable
efforts to return the children to her, termination based on her alleged mental
illness or deficiency was not supported by the evidence.  In his issues,
Antonio contends that the evidence was legally and factually insufficient to
support the trial court’s findings (1) that he constructively abandoned the
children while they were in the temporary conservatorship of the Department (Issues
1 and 2); (2) that he failed to comply with the provisions of a court order
that specifically established the actions necessary for him to obtain the
return of his children (Issues 3 and 4); (3) that termination of his parental
rights was in the best interest of the children (Issues 5 and 6); and (4) that,
because the Department made reasonable efforts to return the children to him,
termination based on his alleged mental illness or deficiency was not supported
by the evidence (Issues 7 and 8).

Legal
and Factual Sufficiency

            Termination
of parental rights must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001 (West
Supp. 2011).  To determine if the evidence is legally sufficient in a parental
termination case, we review all of the evidence in the light most favorable to
the finding and determine whether a rational trier of fact could have formed a
firm belief or conviction that its finding was true.  In re J.P.B., 180
S.W.3d 570, 573 (Tex. 2005).  To determine if the evidence is factually
sufficient, we give due deference to the finding and determine whether, on the
entire record, a factfinder could reasonably form a firm belief or conviction
about the truth of the allegations against the parent.  In re C.H., 89
S.W.3d 17, 25–26 (Tex. 2002).

            To
terminate parental rights under Section 161.001, it must be shown by clear and
convincing evidence that a parent has committed one of the acts listed in
Section 161.001(1)(A)–(T) and that termination is in the best interest of the
child.  Section 161.001.  In this case, the trial court found that the parents
committed two of the acts listed in Section 161.001(1).  Specifically, the
trial court found that Connie and Antonio had:

 [1]
constructively abandoned the children who have been in the permanent or
temporary managing conservatorship of the [Department] for not less than six
months and: (1) the [Department] has made reasonable efforts to return the
children to the [parent]; (2) the [parent] has not regularly visited or
maintained significant contact with the children; and (3) the [parent] has
demonstrated an inability to provide the children with a safe environment; [and]

 

[2]
failed to comply with the provisions of a court order that specifically
established the actions necessary for the [parent] to obtain the return of the
children who have been in the permanent or temporary managing conservatorship
of the [Department] for not less than nine months as a result of the children’s
removal from the parent under Chapter 262 for the abuse or neglect of the
children.

 

See
Section 161.001(1)(N), (O).  The trial court also found that termination of
Connie’s and Antonio’s parental rights was in the children’s best interest.  See
Section 161.001(2).

            A
trial court may order termination of parental rights under Tex. Fam. Code Ann. § 161.003 (West
2008) when it is shown, and the trial court finds, that:

 (1)
the parent has a mental or emotional illness or a mental deficiency that
renders the parent unable to provide for the physical, emotional, and mental
needs of the child;

 

 (2)
the illness or deficiency, in all reasonable probability, proved by clear and
convincing evidence, will continue to render the parent unable to provide for
the child’s needs until the 18th birthday of the child;

 

 (3)
the department has been the temporary or sole managing conservator of the child
of the parent for at least six months preceding the date of the hearing on the
termination held in accordance with Subsection (c);

 

 (4)
the department has made reasonable efforts to return the child to the parent;
and

 

(5)
the termination is in the best interest of the child.

 

See Section
161.003(a)(1)–(5). In this case, the trial court made the findings required for
termination under Section 161.003.

            The
record shows that, on February 26, 2011, the Department received a report that
Connie and Antonio were neglecting A.W.C. and G.A.C.  At that time, A.W.C. was nineteen
months old, and G.A.C. was five months old.  The Department received
information that Antonio had called friends in Lamesa because he and Connie
were being evicted from their residence in New Mexico; that Antonio had requested
his friends to come to New Mexico and then bring him, Connie, and the children
to Lamesa; that, when Antonio and Connie and the children were picked up in New
Mexico and later arrived in Lamesa, the children “were dirty and smelled” and
Antonio and Connie “had body odor as well”; that Antonio and Connie did not
have any formula for G.A.C.; that Antonio and Connie were giving both children
regular milk to drink; and that the bottles the children were drinking from
“were crusty and filthy.” Kimberly Masters, an employee of the Department, was
the conservatorship caseworker assigned to this case.  Masters testified that, after
the Department received the neglect report, an investigator for the Department made
contact with Antonio, Connie, and the children.  The record showed that this
contact occurred on March 1, 2011.  At that time, the children were very dirty,
and Antonio and Connie were also dirty.  The investigator discovered that
Antonio and Connie were giving both children two percent milk.  On the same
day, the Department removed the children from the care of Antonio and Connie.  The
Department placed A.W.C. and G.A.C. in foster care with Lino and Holly Garcia. 
The children were still in the Garcias’ care at the time of trial.  The
Department’s initial goal in the case was to reunify the children with Antonio
and Connie, but later, the Department’s goal became adoption by the Garcias.

            Masters
testified that A.W.C. and G.A.C. were not current on their immunizations when
they were removed from Antonio and Connie.  Masters also testified about the
condition of the children at the time of removal.  She said that G.A.C. was
developmentally delayed, was not eating properly, and had intestinal problems. Masters
said that A.W.C. was also developmentally delayed.  She said that A.W.C. had
problems with his speech.  Masters explained that A.W.C. did not say any words
and that his mode of communication consisted of “mainly grunts.”  She also said
that A.W.C. was very small and did not have hand/eye coordination.

            Holly
Garcia testified that she was married to Lino Garcia.  Holly testified that
A.W.C. and G.A.C. came to live with Lino and her on March 1, 2011, and had
continually lived with them since that time.  The Garcias had one other foster
child, a three-month-old girl.  Holly testified that she was a stay-at-home
mom.

Holly
testified that A.W.C. and G.A.C. were both sick when they came to live with
her. The Garcias took the children to doctor’s appointments, where the Garcias
learned that both children had sinus infections and double ear infections. 
Holly also testified that both children were “small” when they were placed in
her care. She learned at the children’s doctor’s appointments that both
children were in the fifth percentile.  While in the care of the Garcias, the
children were brought current on their immunizations.

Holly
said that A.W.C. was developmentally delayed in his speech when he came to live
with her.  She said that he had a very limited vocabulary.  After being placed
in the Garcias’ care, A.W.C. attended speech therapy once a week and
occupational therapy twice a week.  Holly said that A.W.C. was almost finished
with speech therapy and that he “talk[ed] all the time now.”  She also said
that A.W.C. was progressing well in occupational therapy and would be attending
“a little more occupational therapy just to learn some more motor skills.”  A.W.C.
did not eat very much when he came to live with the Garcias.  At that time, A.W.C.
was still on a bottle, and it took about a month to get him to consistently eat
solid food.  Holly was informed that G.A.C. had been on whole milk before she
was removed from Antonio’s and Connie’s care.  Holly said that G.A.C. “had a
lot of stomach issues” at first and that it took “a little while to get her
stomach regulated.”

Holly
testified that both children “like[d] to eat [and were] healthy” and that the
children were “growing and thriving.”  Holly said that, at the time of trial,
A.W.C. was “almost past the 12th percentile” and G.A.C. was “already in the 72nd
percentile.”  Holly testified that, at the time of trial, A.W.C. and G.A.C.
were happy, healthy, and stable kids.  Holly said that she and her husband
loved A.W.C. and G.A.C. and wanted to adopt them.

The
record shows that the Department removed another child from Antonio’s and
Connie’s care in 2008.  Antonio and Connie voluntarily terminated their rights
to this child.

Antonio
and Connie both received monthly disability checks.  Antonio received monthly
checks in the amount of $681 and $175.  Connie received a monthly check in the
amount of $175. Antonio had never been employed, and Connie had not been
employed during the pendency of this case.  Neither Antonio nor Connie had a driver’s
license or drove a car.

Antonio
and Connie had a house in Lamesa when they lived in New Mexico.  The record is
not clear as to whether they owned the house.  Antonio and Connie lived in this
house at the time of trial.  When Antonio and Connie arrived in Lamesa from New
Mexico, their house in Lamesa was unlivable.  It had no electricity or running
water.  Antonio and Connie lived in a motel for a lengthy period of time.  Masters
testified that, when she first saw Antonio and Connie’s house, it was “run
down.”  Masters explained that “[she] could see through the floor, through the ceiling,
windows were broken, [and] walls needed to be repaired.”  Hollie Price
testified that she was the Court Appointed Special Advocate (CASA) and guardian
ad litem for A.W.C. and G.A.C.  Price visited Antonio and Connie’s home shortly
after the children were removed from their care.  At that time, Antonio and
Connie did not live in the house.  Price described the condition of the house at
that time as “dirty, [and] almost unlivable.”  Price also said that the house
had holes in the floors and broken windows and that the house did not have
electricity or running water.

Masters
said that, later in the case, members of a church remodeled Antonio and
Connie’s house.  Masters saw the house two or three weeks before trial.  She
said that, although the physical condition of the house was “fine” at that
time, “[the home] had gone back downhill.”  She said that the house was dirty
again and that wind was blowing through windows in the house.

Chris
Powell testified that he was the senior pastor at First Baptist Church in
Lamesa.  He said that, in July 2011, volunteers from his church rewired,
replumbed, painted, and cleaned Antonio and Connie’s house in Lamesa.  The
volunteers also made cosmetic repairs to the house. They patched but did not
replace broken windows in the house.  Powell said that the church provided
Antonio and Connie with a washer and dryer, a stove, a refrigerator, a bed, a
couch, and some other items.  Powell testified that the house was not in a
livable condition before the volunteers worked on it.  He said that it would
have concerned him for children to be in the house in its former condition.

            After
the children were removed from Antonio and Connie, court-ordered service plans
were put into place.  Antonio and Connie were required to comply with the terms
of their respective service plans, which established the actions necessary for
them to obtain the return of A.W.C. and G.A.C.  See Section 161.001(O). 
As required by the plans, Antonio and Connie both completed psychological evaluations
with William E. Hoke, Ph.D. The Department introduced copies of Dr. Hoke’s
reports of the evaluations into evidence as State’s Exhibit No. 1.  Dr. Hoke
determined that Antonio, who was forty-nine years old, had a full-scale IQ of
51.  Dr. Hoke diagnosed Antonio with moderate mental retardation.  Based
on his examination of Antonio, Dr. Hoke concluded in his report as follows:

 Overall,
these results are consistent with severe and chronic mental retardation which
will have a major impact upon his ability to be an appropriate father. 
[Antonio] certainly is unable to care for himself and will require structure
and supervision throughout the remainder of his life.  It is likely that his
wife, [Connie] spends much of her time in taking care of many of his needs.  He
will not be able to live independently and will certainly be unable to provide
an appropriate or safe home for his children.  Although he seems to love them
and is somewhat attached to them, his limitations will place the children at
risk for harm.

  

Recommendations
include [Antonio] continuing with the Plan of Service as prescribed by CPS. 
This should include parenting classes, a clean and appropriate living
arrangement, and any other services deemed appropriate.  If he is able to
receive the assistance he requires, his long-term prognosis may be slightly
improved.  In general, however, his cognitive limitations appear to be  severe
and are unlikely to improve in the future.  As a result, his ability to
adequately care for his children appears to be quite limited and it is very
likely that they would be in danger were they to be placed with him as a
primary paternal figure.

                                                                     
      

            Dr.
Hoke determined that Connie, who was twenty-nine years old, had a full-scale IQ
of 70.  Based on his examination of Connie, Dr. Hoke concluded in his report as
follows:

Overall,
these results suggest significant limitations in many areas in her life.  It
appears that she will struggle to provide an appropriate home for herself and
will also struggle to provide an appropriate and stable home for her children. 
Unfortunately, her level of insight into her deficits appears to be very
limited and it is likely that she will have a difficult time understanding why
anyone might have concerns about her . . . ability to be an appropriate parent.

 

Recommendations
include [Connie] continuing with the Plan of Service as prescribed by CPS. This
should include individual counseling, couples counseling, parenting classes,
homemaker skills training, family counseling, budgeting classes, and all other
services as indicated.  If she is able to receive the assistance she requires,
her long-term prognosis may be slightly improved.  Again, given what appear to
be a number of significant limitations, it is likely that [Connie] will struggle
in the future to be able to provide an appropriate home for her children, yet
may be fairly unaware of her deficits and limitations.

 

The
service plans also required Antonio and Connie to participate in an MHMR
assessment and to follow through with all recommendations provided by MHMR. 
Masters testified that the MHMR services entailed a mental health evaluation
and services, financial budgeting classes, parenting classes, and any other
necessary life skills classes.  The Department included the MHMR services on
the service plans so that Antonio and Connie would have an opportunity to learn
how to take care of themselves and to manage their money.  Additionally, MHMR
would help Antonio and Connie obtain necessary medications and any other
available disability payments.  Masters said that the MHMR services were made
available to Antonio and Connie in Lamesa.

Masters
testified that the Department scheduled appointments for Antonio and Connie to
receive MHMR services on three separate occasions but that Antonio and Connie
did not show up for any of the appointments.  A prior caseworker in the case
set up the first appointment, and Masters set up the second and third
appointments.  Masters testified that Anita Carillon, a Department employee,
attempted to take Antonio and Connie to the last scheduled appointment but that
she could not find them.  Masters said that Antonio and Connie told her that
they went to an MHMR appointment but that they did not need services and so “MHMR
turned them away.” Masters contacted MHMR and confirmed that Antonio and Connie
missed all the scheduled appointments.

            A
temporary order provided that Antonio and Connie would have supervised
visitation with the children a minimum of two hours every other week at the
Department’s office closest to the children’s foster care placement. The
visitations were scheduled to take place in the Department’s office in Odessa.  Because
neither Antonio nor Connie had a driver’s license or a car, the Department provided
round-trip transportation to them for their visits with A.W.C. and G.A.C.  Masters
said that, although the Department made transportation available to Antonio and
Connie, they only visited A.W.C. and G.A.C. on nine of twenty-four scheduled visits. 
Masters testified that, before a scheduled visitation, Carillon would go to
Antonio and Connie’s house and, if they were not home, would then go to places
where they often went, such as convenience stores and restaurants, to look for
them.  On most occasions, Carillon could not find Antonio and Connie.  Masters
said that, the week before trial, Antonio and Connie visited the children for
the first time in four months.

            Connie
testified that she had been getting disability checks since she was five years
old.  Connie said that she was put in special education classes while in
school.  However, she said that, “knowing how smart [she was],” she had no idea
why she was placed in special education classes.  Connie also said that she had
gone to school through the tenth grade.

Connie
testified that she and Antonio went to MHMR.  She said that they “made the
appointments on [their] own.”  Connie said that she talked to a psychiatrist
and a caseworker by videoconference at MHMR.  She testified that, at MHMR, “he”
wanted to give her shots because she was anemic.  Connie said that she did not
“want to take no shots.”  Connie said that, at MHMR, she was told that the only
way she could take classes was to take medication.  Connie said that, a long
time ago, a doctor diagnosed her with schizophrenia.  Connie testified that she
used to take medication for her schizophrenia but that “God ha[d] taken away [her]
mental illness.”  She said that she had promised God that she would not take
any more medications and that she could not break her promise to God.  She said
that “[she had not] taken medication in a long time.”  However, Connie said
that she was currently taking medication for mood swings relating to her going
through menopause.

            With
respect to missing visitation periods with the children, Connie said that she
and Antonio did not hear Carillon knock on the door if Carillon came to their
house to take them to the visits.  Connie said that Carillon tried to make her
look bad and “made [them] miss out on seeing the babies.”  Connie also said
that A.W.C. and G.A.C. were not sick when they were removed from her care.  Connie
testified that she was capable of taking care of the children because Antonio
taught her how to take care of them.

            Connie
also testified about the condition of her and Antonio’s house.  She said that,
at the beginning of the case, the house had no electricity.  However, she said
that a church had put wiring in the house.

Antonio
testified that he and his family came back to Lamesa because their landlord in
New Mexico had “kick[ed] [them] out.”  Antonio testified that their house in
Lamesa needed to be fixed up “a little bit” when he and Connie moved back to
Lamesa from New Mexico.  He said that the church helped fix up their house in
Lamesa.

Antonio
said that A.W.C. and G.A.C. were not sick when they were removed from his care.
 He does not believe that Carillon came to their house to pick up Connie and
him for visits with the children every time that she said she did.  Antonio
said that he and Connie went to MHMR and that, while there, he did a
videoconference with a psychiatrist.  He said that a lady at MHMR told him that
“you don’t need to come here no more.”

            Norma
Rosales testified that she had known Antonio all her life.  She said that
Antonio babysat her children in 1993.  Rosales testified that Antonio was able
to take care of her kids.

            The
evidence, which is summarized above, showed that Antonio’s and Connie’s service
plans required them to participate in an MHMR assessment and to follow through
with all recommendations provided by MHMR.  Masters testified that the
Department made three separate appointments for Antonio and Connie to receive
MHMR services but that Antonio and Connie did not attend any of the appointments.
 Masters confirmed with MHMR that Antonio and Connie missed all their appointments.
 Antonio and Connie testified that they went to MHMR.  The trial court’s
function, as the trier of fact, was to judge the credibility of the witnesses,
assign the weight to be given their testimony, and resolve any conflicts or
inconsistencies in the testimony.  In re R.W., 129 S.W.3d 732, 742 (Tex.
App.—Fort Worth 2004, pet. denied).  The trial court was entitled to believe
all, part, or none of the testimony of any witness.  In re T.N., 180
S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.).  The trial court was free
to believe Masters’s testimony and to disbelieve Connie’s and Antonio’s
testimony.  Based on the evidence presented at trial, the trial court could
reasonably have formed a firm belief or conviction that Connie and Antonio both
failed to comply with the court-ordered service plans.  Therefore, the evidence
is legally and factually sufficient to support termination under Section
161.001(1)(O) of the Texas Family Code.

            Connie’s
second point of error and Antonio’s third and fourth issues are overruled. 
Because only one ground is needed to support a termination order, we need not
address Connie’s first and third points of error and Antonio’s first, second,
seventh, and eighth issues challenging the sufficiency of the evidence to
support the trial court’s findings under Sections 161.001(1)(N) and 161.003 of
the Texas Family Code.

            In
his fifth and sixth issues, Antonio challenges the sufficiency of the evidence
to support the trial court’s finding that termination of his parental rights
was in the best interest of A.W.C.  and G.A.C.  The focus is on the children’s
best interest, not that of the parents.  Dupree v. Tex. Dep’t of Protective
& Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.—Dallas, no writ). 
With respect to the best interest of a child, no unique set of factors need be
proved.  In re C.J.O., 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010,
pet. denied).  But, courts may use the non-exhaustive Holley factors to
shape their analysis.  Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex.
1976).  These include, but are not limited to, (1) the desires of the child,
(2) the emotional and physical needs of the child now and in the future, (3)
the emotional and physical danger to the child now and in the future, (4) the
parental abilities of the individuals seeking custody, (5) the programs
available to assist these individuals to promote the best interest of the
child, (6) the plans for the child by these individuals or by the agency
seeking custody, (7) the stability of the home of proposed placement, (8) the
acts or omissions of the parent that may indicate that the existing
parent-child relationship is not a proper one, and (9) any excuse for the acts
or omissions of the parent.  Id.  Additionally, evidence that proves one
or more statutory grounds for termination may also constitute evidence
illustrating that termination is in the child’s best interest.  In re C.J.O.,
325 S.W.3d at 266.  A trier of fact may measure a parent’s future conduct by
his or her past conduct and determine that it is in the child’s best interest
to terminate parental rights.  In re D.S., 333 S.W.3d 379, 384 (Tex.
App.—Amarillo 2011, no pet.).

            The
record shows that A.W.C. and G.A.C. were removed from Connie’s and Antonio’s
care on March 1, 2011.  Since that date, the children had been living with the
Garcias.  The children had thrived while in the Garcias’ care.  The Garcias had
provided a stable environment for the children and had met the children’s
needs.  A.W.C. and G.A.C. had a good relationship with the Garcias, and the
Garcias wanted to adopt them.  On the other hand, Connie and Antonio had not
exhibited adequate parenting abilities in the past.  The evidence demonstrated
that they could not provide A.W.C. and G.A.C. a safe and stable home
environment or meet their physical and emotional needs.  Further, the evidence
showed that Connie and Antonio likely would not be able to sustain a safe and
stable environment or to meet the children’s needs in the future.  Considering
Connie’s and Antonio’s past conduct, the trial court could have reasonably
concluded that Connie and Antonio would not be able to provide the children
with a safe and stable environment or to meet their needs in the future.

            Based
on the evidence, the trial court could reasonably have formed a firm belief or
conviction that termination of Connie’s and Antonio’s parental rights would be
in the best interest of A.W.C. and G.A.C.  Therefore, we cannot conclude that
the trial court’s best interest finding is not supported by clear and
convincing evidence.  The evidence is legally and factually sufficient to
support the finding that termination of Connie’s and Antonio’s parental rights
is in the best interest of A.W.C. and G.A.C.  Antonio’s fifth and sixth issues
are overruled.

This
Court’s Ruling

            We
affirm the trial court’s order terminating Connie’s and Antonio’s parental rights
to A.W.C. and G.A.C.

 

                                    

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

July 12, 2012

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.









[1]In some parts of the record, the children are referred
to as A.W.C., Jr. and G.A.S.C.